IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| DONALD BROWN,<br>    Plaintiff<br><br>  v.<br><br>BANK OF AMERICA CORPORATION, NEWREZ, LLC d/b/a SHELLPOINT MORTGAGE SERVICING, and THE BANK OF NEW YORK MELLON CORPORATION,<br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 1:19-cv-00327-MSM-LDA |

MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

This matter comes before the Court on Motions for Summary Judgment filed by defendant Bank of America (ECF No. 51) and defendants NewRez, LLC d/b/a Shellpoint Mortgage Servicing and The Bank of New York Mellon Corporation (ECF No. 36) as well as the defendants' Motions to Strike (ECF Nos. 30 and 40). For the following reasons, the Court GRANTS the defendants' Motions for Summary Judgment (ECF Nos. 30 and 40) and DENIES as moot the defendants' Motions to Strike (ECF Nos. 36 and 51).

I.   BACKGROUND

A. Loan

On December 21, 2006, the plaintiff, Donald H. Brown ("Mr. Brown"), executed

1

an adjustable-rate note promising to repay $290,000.00 to the lender, Countrywide Home Loans, Inc. ("Countrywide"), in connection with residential property located at 33 Gibbs Lane, Unit 4, Portsmouth, Rhode Island ("Property"). (ECF No. 31-1 at 10.) On the same day, Mr. Brown executed a mortgage on the property with Mortgage Electronic Registration Systems, Inc. ("MERS") as the nominee for Countrywide. (ECF No. 31-1 at 14.) The mortgage provides, in paragraph 22, for the lenders' power of sale in the event of the borrower's breach of the mortgage terms. (ECF No. 31-1 at 22-23.)

The defendants have become connected to Mr. Brown's home loan and mortgage over the course of several years and through various transfers and assignments common in the mortgage universe. On July 1, 2008, Bank of America Corporation ("BOA")[1] acquired Countrywide in the midst of a nationwide financial crisis. Reuters, https://www.reuters.com/article/us-bankofamerica-countrywide/bank-of-america-completes-countrywide-buy-idINN0148670320080701 (last visited September 10, 2021).

In 2011, MERS transferred Mr. Brown's mortgage to The Bank of New York Mellon ("BoNYM"). (ECF No. 31-1 at 34.) At that time, Mr. Brown's loan was serviced by Bank of America Home Loans Servicing, LP ("BAC Home Loans"), a subsidiary of Bank of America, N.A. BAC Home Loans eventually transferred loan servicing to Specialized Loan Servicing, LLC ("SLS"), which assumed oversight of Mr.

---

[1] BOA is the parent company of Bank of America, N.A., which "is the successor by July 1, 2011, de jure merger to BAC Home Loans Servicing, LP, formerly known as Countrywide Home Loans Servicing." (ECF No. 41-7 at 4.)

Brown's mortgage payments (ECF No. 31-1 at 36); Loan servicing transferred again in 2016 to defendant NewRez, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") (ECF No. 31-1 at 41).

### B. Default and Trial Period Plan

It is uncontested that Mr. Brown stopped making his mortgage payments in 2009. (ECF No. 1-1 at 3.) In September and October of that year, Mr. Brown and BAC Home Loans communicated regarding potential loan modification options, including those available under the Home Affordable Modification Program ("HAMP") created by the federal government to assist individuals who had fallen behind on their mortgage payments. (ECF No. 1-3 at 24.) In a letter dated September 14, 2009, BAC Home Loans outlined the requirements for a "three-month trial period for your mortgage loan modification." *Id.* The letter indicated that "under the Federal Government's Home Affordable Modification Program, [BAC Home Loans] may be able to provide a more affordable mortgage payment." *Id.* Mr. Brown was advised by letter to make three "trial period mortgage payments of $1,380.12" each and to return additional documents required to "complete the three-month trial modification process and determine [Mr. Brown's] eligibility for the permanent modification of [his] loan." *Id.* The letter further provided that "[i]f [BAC Home Loans] determine[s] that you are not eligible for a permanent modification under the Home Affordable Modification Program, we will contact you to review other options." *Id.*

In a subsequent letter to Mr. Brown dated September 25, 2009, BAC Home

Loans provided a checklist for the documents and forms required "to finalize the three-month trial modification period and qualify for the permanent modification of your loan." (ECF No. 31-1 at 57.) This letter cautioned that "[i]f for some reason you are not eligible for the Home Affordable Modification Program once you've started the trial period, we will contact you and review other options." *Id.* The payment coupons accompanying the September 25th letter instructed Mr. Brown to make the three-month trial period plan payments in lieu of, and not in addition to, his regular mortgage payments. *Id.*

BAC Home Loans supplied Mr. Brown with a customer copy of the "Home Affordable Modification Trial Period Plan" ("TPP"), which Mr. Brown signed and returned. (ECF No. 1-3 at 19.) Mr. Brown understood that if he "compli[ed] with this Trial Period Plan . . . and [his] representations in Section 1 continue to be true in all respects, then the Servicer will provide [Mr. Brown] with a Home Affordable Modification Agreement . . . as set forth in Section 3…." *Id.* Eligibility for the HAMP loan modification required compliance with the TPP terms and by executing the TPP Mr. Brown acknowledged and accepted the following:

> [T]hat the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed. I further understand and agree that the Servicer will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan.

*Id.*

4

The parties do not dispute that Mr. Brown made the required TPP payments.[2] (ECF No. 34 at 5.) Mr. Brown then made five additional payments in the same amount of $1,380.12 in January, February, March, May, and June 2010. *Id.* It was not until May 6, 2010, well after the three-month TPP was supposed to end, that BAC Home Loans informed Mr. Brown that his HAMP loan modification request had been reviewed and deemed ineligible because of a negative "net present value (NPV) of a modification" based on the applicable Department of the Treasury formula required for a HAMP modification.[3] (ECF No. 1-3 at 37.) BAC Home Loans' correspondence with Mr. Brown reminded him that participating in the TPP did not alter his original loan obligations (*Id.* at 21) and, when BAC Home Loans determined that it could not offer Mr. Brown a loan modification, it instructed him "to continue making the normal monthly payments required under [his] original loan documents to help avoid foreclosure" (*Id.* at 38).

On June 24, 2010, BAC Home Loans informed Mr. Brown by another letter

---

[2] Although there was some correspondence from BAC Home Loans in 2010 that informed Mr. Brown that he had failed to make one of his payments, that letter appears to have been sent in error.

[3] According to the HAMP Guidelines issued on March 4, 2009, "A standard NPV Test will be required on each loan that is in Imminent Default or is at least 60 days delinquent . . . [and] will compare the net present value (NPV) of cash flows expected from a modification to the net present value of cash flows expected in the absence of modification." The guidelines provide that "[i]f the NPV Test generates a negative result, modification is optional, unless prohibited under contract. www.treasury.gov/press-center/press-releases/Documents/modification_program_guidelines.pdf (last visited September 10, 2021).

5

that he qualified for a "new loan modification offer."[4] (ECF No. 31-1 at 86-93.) The loan modification offer could be accepted by signing and returning the agreement and beginning to make the modified payments. *Id.* at 86. Mr. Brown did not sign and return the agreement. Instead, having continued to make the modified payments of $1,380.12 through June 2010, he stopped making payments altogether. In his Statement of Disputed Facts, Mr. Brown states that he did not reject the June 2010 loan modification offer but that "[h]e thought that he already had an agreement for a permanent modification of his loan flowing from the September 25, 2010 [sic] letter from BOA." (ECF No. 34 at 6.)

### C. Bankruptcy and Foreclosure

Several years later, Mr. Brown filed for bankruptcy. First, he filed for a Chapter 7 bankruptcy in 2016 and then for three Chapter 13 bankruptcies in 2017, 2018, and 2019. *Id.* at 6-7. Mr. Brown admits that he did not include any claims against third parties in the 2016 Chapter 7 filing. *Id.* at p. 7.[5] The 2016 bankruptcy was discharged and each of the Chapter 13 bankruptcies were dismissed. *Id.* at 7-8.

BoNYM notified Mr. Brown in 2018 that it was pursuing foreclosure. On October 4, 2018, BoNYM, through its counsel, sent a notice to Mr. Brown regarding

---

[4] The June 24th loan modification offer, which included delinquent interest and fees to be added to the principal loan amount, required a monthly payment of $2,758.01. (ECF No. 31-1 at 87.)

[5] The parties dispute whether Mr. Brown disclosed any claims in any of his subsequent Chapter 13 Bankruptcies. Such disputed fact, however, is immaterial to the Court's summary judgment decision.

6

foreclosure protections. *Id.* at 8.[6]  According to Mr. Brown, he never received that notice. *Id.* BoNYM then sent a notice to Mr. Brown on December 17, 2018, detailing the foreclosure sale of his property scheduled for February 12, 2019. *Id.*

### D. Lawsuit

On the eve of the foreclosure sale, Mr. Brown sued the defendants in Rhode Island superior court and sought an injunction. *Id.* at 9.  The foreclosure sale was postponed briefly, and Mr. Brown obtained a temporary restraining order ("TRO") which expired on April 17, 2019.[7]  Defendants BoNYM and Shellpoint removed the case to this Court in June of 2019 and on December 24th of that year, BoNYM through its counsel sent another foreclosure sale notice to Mr. Brown. *Id.* Further attempts to avoid the foreclosure sale scheduled for February 27, 2020, were unsuccessful. This Court denied Mr. Brown's TRO request after concluding that Mr. Brown had failed to show a likelihood of success on the merits.  On February 27, 2020, the Property was sold at foreclosure sale. *Id.* at 10.[8]  Mr. Brown has lived at the Property and has been in default on his mortgage since June 2010. (ECF No. 30-1 at 7.)

---

[6] BoNYM has provided a copy of the October 4th notice and submitted an affidavit that supports the date of mailing. (ECF No. 31-1 at 7, 95-106.)

[7] Although Mr. Brown attempts to dispute the expiration of the temporary restraining order, there is nothing in the record, or indeed any procedural rule, to support his claim that a TRO would remain in effect more than a year after it issued.

[8] Mr. Brown does not dispute that the note and mortgage contain "no explicit provision . . . which requires the lender to either modify the mortgage loan or exercise discretion in evaluating a potential modification, prior to initiating foreclosure under paragraph 22." (ECF No. 34 at 3.)

7

### E. Present Posture

In his Amended Complaint, Mr. Brown makes five claims. Count I alleges breach of contract against BOA. Mr. Brown asserts that he and BOA "entered into a valid and enforceable HAMP Agreement[9] in 2009 regarding a loan modification of the property." (ECF No. 1-1 at 6.) In Count II, Mr. Brown maintains that BOA breached the duty of good faith and fair dealing "when it agreed to enter into a valid and enforceable HAMP Agreement with Mr. Brown, received timely payments during the trial period of the HAMP Agreement, and received additional payments beyond the trial period, and then subsequently declined the loan modification." *Id.* at 7. In Counts III and IV, Mr. Brown puts forth breach of contract claims against BoNYM and Shellpoint. He alleges BoNYM committed breach of contract by "initiat[ing] foreclosure proceedings against Mr. Brown, despite knowledge of Mr. Brown's previous compliance with the HAMP Agreement with BOA, thereby breaching the contract it has with Mr. Brown as the holder of the Mortgage, which has to date never been fulfilled due to BOA's conduct." *Id.* at 8. Count III, while wanting for clarity, appears to allege that BoNYM, as successor to the mortgage, was bound to the terms of any permanent loan modification contract entered into by its predecessor. In Count IV, Mr. Brown claims that Shellpoint has also committed breach of contract because "Shellpoint's attempts to pursue collection efforts against Mr. Brown are wrongful

---

[9] In his Complaint, Mr. Brown defines the Home Affordable Modification Plan Trial Period Plan as the "HAMP Agreement." For clarity, Mr. Brown's use of "HAMP Agreement" is misleading and confusing. The accepted term for such a plan is "Trial Period Plan" or "TPP." This discrepancy is problematic. A TPP and permanent HAMP loan modification are not one and the same as will become clear.

8

and in breach of the mortgage" as a result of "BOA's wrongful conduct in failing to make the loan modification permanent…." *Id.* Finally, in Count V, Mr. Brown asserts BoNYM violated R.I. Gen. Laws § 34-27-3.1 by failing to provide the required form notice under the statute. *Id.* at 9.

The three defendants have moved for summary judgment, with BoNYM and Shellpoint filing their motion jointly. (ECF No. 30.) Mr. Brown opposes both motions for summary judgment. (ECF Nos. 33 and 45.) The defendants have also moved to strike portions of Mr. Brown's affidavits in support of his opposition to summary judgment; they argue that it contains improper evidence (ECF Nos. 36 and 51.) As stated above, the motions for summary judgment may be decided without reference to the affidavit statements in question and the motions to strike are denied as moot.

Each of Mr. Brown's claims, except for Count V, turns on (1) whether Mr. Brown and BAC Home Loans entered into a contract in the fall of 2009, (2) what precisely that contract required, and (3) whether there was a breach of such contract.

The Court is sensitive to the challenges and hardships endured by homeowners and mortgagors in the years since 2008. The financial crisis precipitated by the subprime mortgage lending that pervaded the turn of the last century resulted in a series of federally created initiatives and programs designed to help homeowners whose financial circumstances were out of sync with their required home loan payments. As is evident in this case, and in others brought under similar circumstances, these programs, and the banks tasked with implementing them, are not without their faults. The outcome in this case, however, does not depend upon

9

these imperfect responses to the financial crisis but upon whether Mr. Brown has presented sufficient facts to survive summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment's role in civil litigation is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug. Inc.*, 895 F.2d 46, 50 (1st Cir. 1990). Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact. *Id.* at 49. "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000).

In ruling on a motion for summary judgment, the Court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000) (citing *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 672 (1st Cir. 1996)). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995). Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because

the opponent is unlikely to prevail at trial. If the evidence presented 'is subject to conflicting interpretations, or reasonable [people] might differ as to its significance, summary judgment is improper.'" *Gannon v. Narragansett Elec. Co.*, 777 F. Supp. 167, 169 (D.R.I. 1991) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure,* § 2725, at 106-09 (1983)).

Whether summary judgment is appropriate in this case first requires the Court to determine the absence or presence of a contract.

### III.   DISCUSSION

#### A.   Count I – BOA Breach of Contract

The parties acknowledge that under Rhode Island law, a valid contract exists where there are: "competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation." *DeAngelis v. DeAngelis*, 923 A.2d 1274, 1279 (R.I. 2007) (citing *R.I. Five v. Med. Assocs. of Bristol Cty., Inc.*, 668 A.2d 1250, 1253 (R.I. 1996)). The defendants further acknowledge Mr. Brown's execution of a TPP. (ECF Nos. 31 at 4-5; 41 at 2.) As mentioned above, Mr. Brown's papers define his "Home Affordable Modification Trial Period Plan" as a "HAMP Agreement." (ECF No. 45-1 at 3.) The plaintiff also describes the "Home Affordable Modification Trial Period Plan" as a "loan modification agreement." *Id.* at 15. The preliminary task for the Court is to determine whether these competing terms indicate an issue of disputed material fact as to the parties' obligations regarding Mr. Brown's mortgage. As explained below, the Court finds no issue of material fact exists with respect to the TPP and that the TPP was not a permanent loan modification agreement,

notwithstanding Mr. Brown's creative nomenclature.

### 1. Contract

"The determination of whether a contract exists is a question of law…." *Haviland v. Simmons*, 45 A.3d 1246, 1257 (R.I. 2012) (citing *Nonnenmacher v. City of Warwick,* 722 A.2d 1199, 1202 (R.I.1999)). Mr. Brown's TPP has all the necessary elements of a contract. The September 15, 2009, letter from BAC Home Loans detailed the initial offer for the TPP. (ECF No. 31-1 at 54.) In particular, the letter indicates that it is in reference to a "three-month trial period for your mortgage loan modification" and indicates that the TPP participant "will receive a package with additional details and documents that we need returned to us so we can complete the three-month trial modification process and determine your eligibility for the permanent modification of your loan." *Id.* The letter instructs the mortgagor to "[g]et started by making your first trial period mortgage payment." *Id.* In a follow-up letter dated September 25, 2009, BAC Home Loans reminded Mr. Brown to make his first trial period payment "to begin the trial period while you gather the requested documentation." *Id.* At 57. After the first trial payment, "the next step is . . . to return the requested documents and enclosed forms in order to finalize the three-month trial modification period and qualify for the permanent modification of your loan." *Id.* Mr. Brown submitted his first TPP payment and executed the TPP on October 5, 2009. There is no dispute that Mr. Brown accepted the TPP offer and made the three

required payments[10] in October, November, and December 2009.

From the plain language of the BAC Home Loans letters and the executed TPP itself, the TPP is not a Home Affordable Modification Agreement "that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." *Id.*

The mutual agreement contained in the TPP is captured by the following language:

> If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all my income . . . to determine whether I qualify for the offer described in this [Trial Period] Plan (the "[Modification Agreement] Offer"). I understand that after I sign and return two copies of this [Trial Period] Plan to the Servicer, the Servicer will send me a signed copy of this Plan if I qualify for the [Modification Agreement] Offer or will send me written notice that I do not qualify for the [Modification Agreement] Offer.

(ECF No. 1-3 at 83.) The TPP was an agreement, supported by consideration, between the mortgagor, Mr. Brown, and BAC Home Loans that required Mr. Brown to submit certain financial documents to the bank in addition to his trial payments and, in return, required BAC Home Loans to determine whether Mr. Brown qualified for and would therefore be offered a permanent loan modification under HAMP. Contrary to Mr. Brown's argument, however, the TPP articulated what it did *not* require.

During the period (the "Trial Period") commencing on the

---

[10] It is undisputed that Mr. Brown also made additional payments in the same amount as required under the TPP in January, February, March, May, and June of 2010.

13

> Trial Period Effective Date and ending on the earlier of: (i) the first day of the month following the month in which the last Trial Period Payment is due (the "Modification Effective Date") or (ii) termination of this Plan, I understand and acknowledge that:
>
> …
>
> G. I understand that the Plain is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification[11], (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed. I further understand and agree that the Servicer will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan.

*Id.* at 84-85.) The Court finds that to the extent Mr. Brown claims a breach of contract, the contract in question was a TPP. It was *not* a permanent loan modification.[12] To summarize, based on the plain language of the TPP, if Mr. Brown made his three required TPP payments, complied with the TPP's terms, *and* met the HAMP loan modification conditions, then BAC Home Loans would offer Mr. Brown a HAMP loan modification. If Mr. Brown failed to meet any of these conditions, however, then he would not qualify, and would not be entitled to, a HAMP loan modification.

---

[11] As mentioned, HAMP Loan Modifications are contingent upon the mortgagor meeting certain criteria outlined in the Treasury Department guidelines. Among these criteria is the NPV.

[12] Finding the TPP here amounted to a contract is in line with the First Circuit's decision in *Young v. Wells Fargo, N.A.*, which treated the TPP at issue in that case as a contract for purposes of the defendant's motion to dismiss. In *Young*, the parties did not dispute that the TPP amounted to a contract, but rather contested the alleged breaches. 717 F.3d 224, 231-32 (1st Cir. 2013).

### 2. Breach

Applying Rhode Island law to the plaintiff's breach of contract claims, as this Court must, to prevail Mr. Brown must demonstrate "that (1) an agreement existed between the parties, (2) the defendant[s] breached the agreement, and (3) the breach caused (4) damages to the plaintiff." *Barkan v. Dunkin' Donuts, Inc.*, 627 F.3d 34, 39 (1st Cir. 2010) (citing *Petrarca v. Fid. & Cas. Ins. Co.*, 884 A.2d 406, 410 (R.I. 2005)).

The Court has determined from the undisputed facts that the first element is satisfied – an agreement did exist between Mr. Brown and BAC Home Loans. The next question is whether a breach occurred. Mr. Brown's confusing terminology makes it difficult to determine whether he intended to set out a claim for breach of a permanent loan modification agreement or for breach of a TPP. But, as explained above, there was no permanent loan modification agreement. The Court will therefore consider the breach of contract claim in connection with the TPP.

Pursuant to the TPP, BAC Home Loans, for its part, needed to consider Mr. Brown for a permanent loan modification, and, if Mr. Brown complied and satisfied the HAMP modification conditions, then BAC Home Loans would issue a loan modification agreement. BAC Home Loans failed to timely issue a loan modification or to timely notify Mr. Brown that his application had been denied. It is undisputed that BAC Home Loans denied Mr. Brown's HAMP loan modification in May 2010, several months after Mr. Brown submitted the last of the three payments required under the TPP.[13] Mr. Brown was denied a permanent loan modification under HAMP

---

[13] Among the frequently asked questions section included with the TPP, BAC Home Loans estimated that "[i]t may take up to 45 days for us to review your documents

15

on May 6, 2010, because the HAMP guidelines required a net present value ("NPV") calculation of the HAMP loan modification for Mr. Brown. (ECF No. 31-1 at 83.) Based on Mr. Brown's loan and financial information, the NPV was negative and, therefore, would not "be in the financial interest of the investor." *Id.* It is this denial that Mr. Brown improperly identified as a breach of a permanent loan modification contract. But the only breach that is apparent to the Court is BAC Home Loans' untimely denial of the HAMP loan modification.[14] To satisfy the third and fourth breach of contract elements, Mr. Brown must establish that the late notification caused him injury.

### 3. Damages

"To make out a viable claim for breach of contract, the party alleging the breach must prove the amount of damages it has suffered with a reasonable degree of certainty." *T.G. Plastics Trading Co., Inc. v. Toray Plastics (Am.), Inc.*, 958 F. Supp. 2d 315, 325 (D.R.I 2013) (citing *Nat'l Chain Co. v. Campbell*, 487 A.2d 132, 134-35 (R.I. 1985)). The plaintiff, therefore, "bears the burden of proof in showing, 'by competent evidence, the amount of damages that it suffered because of [the defendant's] failure to perform." *Id.* (citing *Nat'l Chain Co.*, 487 A.2d at 134-35). At

---

once they are received" to complete the modification request process and determine whether the applicant qualifies for the HAMP loan modification. (ECF No. 31-1 at 80.)

[14] The Court notes that the necessary calculation that resulted in the negative NPV meant that Mr. Brown would have been denied HAMP loan modification regardless of whether BAC Home Loans sent its denial to Mr. Brown on January 6, 2010, or May 6, 2010. If anything, given the June 24, 2010, offer, it seems that Mr. Brown actually benefitted from the delay because he made several months' worth of payments at the lower TPP rate.

this stage of litigation and "[o]n issues as to which the nonmovant bears the ultimate burden of proof, he may not defeat a properly focused motion for summary judgment by relying upon mere allegations or evidence that is less than significantly probative." *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).

Although BAC Home Loans did not render its decision within the trial period and the Modification Effective Date passed without a denial or approval of Mr. Brown's permanent loan modification, Mr. Brown presents no facts or evidence to suggest that such a lapse caused him injury. Mr. Brown does not dispute that he owed $653,014.13 at the time of the foreclosure sale. (ECF No. 34 at 1.) He further acknowledges that, as recently as December 2020, he continued to reside at the Property even after the foreclosure sale. (ECF No. 33-1 at 1.) The Court is hard-pressed, in fact, to find among the papers before it, a specific allegation presented by Mr. Brown sufficient to establish that he incurred any compensable injury during the decade in which he remained in his house without making mortgage payments. At this stage, Mr. Brown cannot rely solely on bare assertions of damages contained in his Amended Complaint. The Court finds the absence of any disputed material fact that suggests or even hints at damages sounds a death knell of Mr. Brown's breach of contract claim against BOA based upon the TPP.

### B. Count II – BOA Breach of Implied Covenant of Good Faith and Fair Dealing

In addition to the breach of contract claim against BOA, Mr. Brown alleged a breach of the implied covenant of good faith and fair dealing against BOA.

17

"[V]irtually every contract contains an implied covenant of good faith and fair dealing between the parties." *Dovenmuehle Mortg., Inc. v.* Antonelli, 790 A.2d 1113, 1115 (R.I. 2002) (quoting *Centerville Builders, Inc. v. Wynne*, 683 A.2d 1340, 1342 (R.I. 1996)) (alteration in original). The Rhode Island Supreme Court has held, however, "that a claim for breach of the implied covenant of good faith and fair dealing does not create an independent cause of action separate and apart from a claim for breach of contract." *McNulty v. Chip*, 116 A.3d 173, 185 (R.I. 2015) (citing *A.A.A. Pool Serv. & Supply, Inc. v. Aetna Cas. & Sur. Co.*, 395 A.2d 724, 725-26 (1978)). Because Mr. Brown breach of contract claim against BOA cannot survive summary judgment, this claim also fails.

### C. Count III and Count IV – BoNYM and Shellpoint Breach of Contract

In his Amended Complaint, Mr. Brown asserts that BoNYM "unfairly initiated foreclosure proceedings . . . thereby breaching the contract it has with Mr. Brown as the holder of the Mortgage…." (ECF No. 1-1 at 8.) Although Mr. Brown originally asserted a breach of the mortgage contract in the Amended Complaint, he pivots in his Opposition to BoNYM and Shellpoint's Motion for Summary Judgment and suggests that BoNYM was bound to "honor the permanent modification" when the mortgage was assigned to it in 2011 and seems to present a new claim that BoNYM breached the alleged permanent loan modification agreement, rather than the mortgage contract. *Id.* at 13.

It matters little whether Mr. Brown has alleged a breach of the mortgage contract or a breach of the alleged loan modification against BoNYM – both fail. As

18

previously explained, the TPP was not a contract for loan modification. The TPP, therefore, did not modify Mr. Brown's mortgage. As for a breach of the mortgage contract, Mr. Brown has not presented any facts to support a contention that BoNYM foreclosed on the property in breach of any of the terms of mortgage. Mr. Brown's breach of contract claim against Shellpoint suffers the same fate. Again, no permanent loan modification altered the terms of the mortgage contract and Mr. Brown presents no support for his claim that Shellpoint is in breach of the mortgage.

### D. Count V – BoNYM Violation of R.I.G.L. § 34-27-3.1

Mr. Brown's Amended Complaint alleges in Count V that BoNYM violated the foreclosure counseling notice requirements under R.I.G.L § 34-27-3.1 because, according to Mr. Brown, he never received the notice. Pursuant to the statute, the foreclosing entity is "to . . . provide by first class mail" the form notice to the mortgagor. In its Motion for Summary Judgment, BoNYM has supplied the Court with a copy of the Oct. 4, 2018, notice of foreclosure protections that it sent pursuant to § 34-27-3.1 and has submitted a corresponding affidavit. (ECF No. 31 at p. 7; Exhibits A-1, A-11.) Whether Mr. Brown received the notice is not the relevant question. As this Court has made clear, "[u]nder Rhode Island law, the date of postmark is 'conclusive' (albeit not exclusive) evidence of the date of mailing." *Cepeda v. Fay Servicing, LLC*, 2020 WL 5775900, at *5 (D.R.I. Sept. 28, 2020) (quoting *Rivera v. Emps.' Ret. Sys. of R.I.*, 70 A. 3d 905, 911 (R.I. 2013)). The Court is, therefore, satisfied in this case that BoNYM complied with the statute and provided the § 34-27-3.1 notice when it was mailed on October 4, 2018, at least 71 days before it sent

the notice of foreclosure sale.

## IV. CONCLUSION

The Motions for Summary Judgment are GRANTED and the Motions to Strike are DENIED as moot.

IT IS SO ORDERED:

_____
Mary S. McElroy
United States District Judge

September 15, 2021